2019R00867 HS/CLD

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 21-234(MCA) |
| | : | |
| v. | : | 18 U.S.C. § 1349 |
| | : | 15 U.S.C. §§ 78j(b) and 78ff |
| SETH LEVINE | : | 17 C.F.R. § 240.10b-5 |

**INFORMATION**

The defendant having waived in open court prosecution by indictment, the Acting United States Attorney for the District of New Jersey charges that:

**COUNT 1**
**(Conspiracy to Commit Bank Fraud)**

1.  At times relevant to this Information:

**Relevant Entities and Individuals**

a.  Defendant SETH LEVINE ("LEVINE") resided in or near New Jersey. He was the founding partner, owner, and managing member of Norse Holdings LLC ("Norse Holdings"), which had its principal place of business in New Jersey.

b.  Norse Holdings was the parent company of more than 70 other limited liability companies (the "Subsidiary Companies"), of which LEVINE was also the founding partner, owner, and managing member.

c.  Each of the Subsidiary Companies owned one or more multifamily buildings, more commonly known as apartment buildings, located primarily in New Jersey.

    d. In total, through Norse Holdings, and the Subsidiary Companies, LEVINE controlled at least 70 multifamily properties, comprising approximately 2,500 apartments (the "Multifamily Properties").

    e. Victim Lenders 1, 2, and 3 were financial institutions as defined by Title 18, United States Code, Section 20.

    f. Investor Victims were individuals who invested in LEVINE's Subsidiary Companies.

    g. The Federal Home Loan Mortgage Corporation, known as "Freddie Mac," and the Federal National Mortgage Association, known as "Fannie Mae," were chartered by Congress with a mission to provide liquidity, stability, and affordability to the U.S. housing and mortgage markets.

    h. Freddie Mac and Fannie Mae worked with certain approved financial institutions. The financial institutions then sold loans to Fannie Mae and Freddie Mac, leaving the financial institutions with additional money to originate more loans.

**<u>The Multi-Family Property Mortgage Lending and Refinance Process</u>**

  2. A "cash-out refinance" mortgage loan was a type of mortgage loan funded by mortgage lenders and other financial institutions in which the borrower obtained a new mortgage for an amount greater than the amount owed on the old outstanding mortgage loan. At closing, the old mortgage was paid-off and after costs and fees were paid, the borrower received the difference between the new mortgage loan and the old mortgage.

3. Typically, before a lender determined whether it would issue a loan to a borrower to purchase or refinance a multifamily property, the lender evaluated various factors, including information provided by the borrower about the property's value and the financial condition of the borrower.

4. For refinances, to evaluate the value of a property, lenders typically required borrowers to provide documentation that included a "rent roll" and a "trailing twelve statement."

5. A "rent roll" was a document listing, among other things: (1) all of the tenants in a multifamily property during a specific time frame; (2) the amount of rent paid by each tenant; and (3) the total rental income for the property during the time frame. A rent roll often also included tenants' move-in dates and dates their leases expired. Lenders considered rent rolls when a borrower applied for a loan to evaluate whether the refinanced property produced enough income to cover the mortgage and other expenses.

6. A "trailing twelve statement," commonly referred to as a "T12" or "pro forma," set forth the income and expenses for a property for the preceding twelve months. A typical T12 would include information about income from rents and other revenue streams, as well as expenses, including real estate taxes, insurance, utilities, payroll, repairs, maintenance, and property management fees.

7. Lenders issuing loans for multifamily properties would generally loan a maximum of eighty percent of the value of the properties. Borrowers who acquired properties using loans from lenders were responsible for paying the

remaining purchase price, which included the down payment and closing costs, commonly known as the "cash to close" or "borrower's equity."

8. Lenders also required borrowers to disclose individuals who owned a significant share of any property that the owners were attempting to refinance.

9. Freddie Mac required borrowers to submit T12s and details about any individual or entity that owned 25 percent or more of a property that borrowers were seeking to refinance with a lender who planned to subsequently sell the loan to Freddie Mac.

### The Bank Fraud Conspiracy

10. From at least in or about 2009 through in or about August 2019, in the District of New Jersey and elsewhere, the defendant,

SETH LEVINE,

did knowingly and intentionally conspire and agree with others, the co-conspirators, to execute and attempt to execute a scheme and artifice to defraud financial institutions, as defined in Title 18, United States Code, Section 20, including Victim Lenders 1, 2, and 3 and other Victim Lenders, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, these financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

### Goal of the Conspiracy

11. It was the goal of the conspiracy for LEVINE and co-conspirators to

enrich themselves by inducing financial institutions to issue mortgage loans based on false pretenses, representations, and promises.

## Overview of the Conspiracy

12. It was part of the conspiracy that:

   a. From at least in or about 2009 and through in or about August 2019, LEVINE directed a scheme to refinance the Multifamily Properties held in the names of the Subsidiary Companies using fraudulent information about the true value of, and the income generated by, the Multifamily Properties. The fraudulent information submitted by LEVINE and others included misrepresentations about the rents collected, the number of apartments leased, expenses, and the true owners of the properties. As a result of each fraudulent refinance, the Subsidiary Company that owned the multifamily property received a cash payout, which LEVINE and his co-conspirators used for their own enrichment, to repay investors, and continue the conspiracy. Because the refinances were obtained with fraudulent data regarding the properties' income and expenses, the Multifamily Properties were overvalued and rents and other income from the properties did not cover the mortgage payments and other expenses associated with the properties.

   b. To cover the shortfalls, LEVINE obtained additional cash-out refinances and used income from the refinances of some Multifamily Properties to cover bills associated with other Multifamily Properties, thereby increasing the total debts incurred by the Subsidiary Companies.

**Additional Manner and Means of the Conspiracy**

13. It was further part of the conspiracy that:

a. LEVINE submitted and caused others to submit fraudulent rent rolls to Victim Lenders. The fraudulent rent rolls inflated monthly rental payments for some tenants and fraudulently listed some vacant apartments as occupied, including false names, rent amounts, and lease information. For example, on or about July 22, 2016, LEVINE, on behalf of Red Clay Norse, LLC obtained from Victim Lender 1 a $10,500,000 mortgage to refinance a Multifamily Property in Wilmington, Delaware. In support of the application, LEVINE knowingly caused the submission of a fraudulent rent roll that falsely stated vacant apartments were occupied and overstated the rent paid by tenants of occupied apartments. As a result of the refinance, Red Clay Norse, LLC received approximately $1,133,578.95 in a cash payout. After closing, Victim Lender 1 transferred the mortgage to Fannie Mae.

b. LEVINE submitted and caused others to submit fraudulent leases to Victim Lenders to create the appearance that vacant apartments and commercial spaces in Multifamily Properties were occupied or overstated the rents paid by tenants of occupied apartments. For example, on or about December 10, 2018, LEVINE, on behalf of Washington Norse, LLC, obtained from Victim Lender 2, a $4,250,000 mortgage to refinance a Multifamily Property in Washington, New Jersey. In support of the application, LEVINE knowingly caused multiple fraudulent leases, which reflected tenants who did not rent apartments or falsely overstated the rent paid by actual tenants, to be

submitted to Victim Lender 2 in order to obtain the mortgage. As a result of the refinance, Washington Norse, LLC, received approximately $919,318.29 in a cash payout.

  c. LEVINE instructed employees to lie to appraisers retained by Victim Lenders or prospective buyers, including to lie about the occupancy and condition of the Multifamily Properties.

  d. LEVINE submitted and caused others to submit false T12 and other income and expense statements to Victim Lenders that overstated the income and understated the expenses of Multifamily Properties.

  e. LEVINE submitted and caused others to submit false Operating Agreements to Victim Lenders that overstated LEVINE's and LEVINE's family's ownership interest in the Multifamily Properties and omitted or reduced Investor Victim ownership interests in the properties. For example, on or about April 12, 2019, LEVINE, on behalf of AC Norse LLC, obtained from Victim Lender 3, a $2,600,000 mortgage to refinance a Multifamily Property in Atlantic City, New Jersey. In support of the application, LEVINE knowingly certified a fraudulent Operating Agreement, dated January 5, 2007, that falsely stated that LEVINE and members of his family held a 100% interest in AC Norse, LLC. In reality, LEVINE had sold interests in AC Norse, LLC to at least four other individuals.

  f. LEVINE submitted and caused others to submit fraudulent personal financial statements to Victim Lenders, claiming, among other things, that LEVINE owned a greater percentage interest in properties than he truly

owned.

  g. LEVINE submitted and caused others to submit fraudulent Member Consents for refinancing, falsely indicating the consent of all investors in the property, to Victim Lenders.

  h. LEVINE forged and caused to be forged signatures on documentation submitted to Victim Lenders.

  i. In total, at the time the conspiracy was discovered, the outstanding balance of the mortgages on the Multifamily Properties was more than $150,000,000, including 40 mortgages held by Freddie Mac with an outstanding loan balance of approximately $103,000,000. In total, the conspiracy resulted in the Victim Lenders suffering a loss of at least $65,000,000.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (Securities Fraud)

1.	Paragraphs 1 through 9 and 12 through 13 of Count One of this Information are realleged and incorporated herein.

### The Securities Fraud Scheme

2.	From at least in or about 2009 through in or about August 2019, in the District of New Jersey and elsewhere, the defendant,

### SETH LEVINE,

willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon persons, to wit, SETH LEVINE engaged in a scheme to commit securities fraud regarding interests in the Subsidiary Companies.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Goal of the Securities Fraud Scheme

3. It was the goal of the securities fraud scheme for LEVINE to obtain funds for his personal enrichment and to continue the scheme by making false and fraudulent representations and promises to the Investor Victims.

### Overview of the Securities Fraud Scheme

4. It was part of the securities fraud scheme that:

a. From at least in or about 2009 through in or about August 2019, the defendant, SETH LEVINE, orchestrated a securities fraud scheme in which he solicited investors to invest in Multifamily Properties based on materially false representations and promises, including about the condition of the properties and the use of investor funds. LEVINE recruited potential investors to pay a portion of the cash to close for the purchase of Multifamily Properties, and as a result, share in the ownership of the properties. In reality, LEVINE sold the same ownership interests in properties multiple times, misrepresenting to investors their true ownership interest in the properties as well as LEVINE's ownership interest, if any.

b. After Multifamily Properties were acquired in the names of the Subsidiary Companies, LEVINE violated representations and promises to the Investor Victims. LEVINE sold off portions of his ownership interests in Multifamily Properties without the consent of the investors, brought on other investors without consent, refinanced Multifamily Properties without consent, and failed to timely disburse proceeds from cash-out refinances to investors. LEVINE used the proceeds for his own enrichment and to continue the scheme.

At times, LEVINE did not even acquire the properties for which he solicited and accepted investors.

   c. In order to carry out the scheme, LEVINE represented that investor funds would be used to improve the Multifamily Properties, leading to financial gains for the investors.  In reality, LEVINE allowed properties to fall into disrepair.  LEVINE misrepresented the profitability and condition of properties to investors, many of whom invested repeatedly with LEVINE, in order to obtain continued investments and sustain the scheme.  LEVINE also co-mingled investor funds and used the funds in violation of representations made to investors, including by using investor money to support other Multifamily Properties, make payments to other investors, and further the fraud.

**Additional Manner and Means of the Securities Fraud Scheme**

  5. It was further part of the securities fraud scheme that:

   a. LEVINE solicited investors in person, by phone, and by email to invest in Multifamily Properties that LEVINE represented he intended to finance with new mortgages obtained in the names of the Subsidiary Companies created for the purpose of owning the Multifamily Properties. LEVINE represented that he and his immediate family would contribute between 33% and 50% of the required cash to close.

   b. LEVINE solicited investors to contribute the remaining funds required to purchase a property, falsely promising them a pro rata share of the ownership interest of the Subsidiary Company that purchased the property.

11

      c.      LEVINE falsely represented to investors that their investment and his conduct would be limited by an Operating Agreement for the Subsidiary Company.

      d.      The Operating Agreements provided by LEVINE identified the purported ownership interest of LEVINE and the investors in the properties and typically included the following provisions:

      (i)      Members of a Subsidiary Company, including LEVINE and his immediate family, were restricted from selling their interest in a Subsidiary Company (and thus their interest in the Multifamily Properties) without the consent of members holding a majority interest in a Subsidiary Company;

      (ii)      LEVINE, as Manager of the Subsidiary Companies, was further restricted from selling his ownership interest in a Subsidiary Company without offering the other members the opportunity to sell their interests at the same value as LEVINE;

      (iii)      New membership interests in a Subsidiary Company could not be issued without the consent of all members;

      (iv)      LEVINE, as the Manager, was responsible for the Multifamily Properties, including maintaining the Multifamily Properties and paying utilities, taxes, and assessments;

      (v)      LEVINE was not permitted to sell or borrow money on behalf of a Subsidiary Company, including the refinance of a Multifamily Property, without the consent of a majority in interest of the members; and

     (vi) Distributions of net cash flow, including cash-out refinances, were to be made at least annually, and LEVINE, as Manager, was required to use his best efforts to make distributions quarterly; and

     (vii) LEVINE, as the Manager, was responsible for establishing separate bank and investment accounts for Subsidiary Companies and separate capital accounts for investors. Co-mingling of funds was expressly prohibited.

   e. LEVINE caused Investor Victims to receive fraudulent Operating Agreements that falsely overstated LEVINE's ownership share in Subsidiary Companies and corresponding investment in Multifamily Properties. In reality, LEVINE often invested little of his own money in purchasing Multifamily Properties and lied to investors about his ownership interest as well as the ownership interests of other investors.

   j. LEVINE forged and caused to be forged signatures on documentation relating to the scheme, such as Operating Agreements.

   f. LEVINE, as Manager of the Subsidiary Companies, was responsible for maintaining the value of the Multifamily Properties. To hide shortfalls in income, LEVINE ignored routine maintenance and failed to make major repairs to buildings, including replacing roofs, which led some apartments to become uninhabitable. LEVINE also hid shortfalls in income by failing to pay utilities, taxes, and assessments, leading utility companies to shut off gas and electric at Multifamily Properties and incurring additional tax and assessment penalties, many of which remained outstanding until the

discovery of the scheme.

    g. At the time the scheme was discovered, Investor Victims had suffered losses in excess of $15 million based on false and misleading statements.

## FORFEITURE ALLEGATION AS TO COUNT ONE

1.  As a result of committing the offense charged in Count One of this Information, defendant,

SETH LEVINE,

shall forfeit to the United States pursuant to Title 18, United States Code, Sections 982(a)(2)(A), any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of the offense charged in Count One of this Information.

## FORFEITURE ALLEGATION AS TO COUNT TWO

2.  As a result of committing the offense charged in Count Two of this Information, the defendant,

SETH LEVINE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION
## (Applicable to All Forfeiture Allegations)

3.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with a third party;

15

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p) (as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)), to forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

*Rachael A. Honig*
RACHAEL A. HONIG
Acting United States Attorney

CASE NUMBER:_____

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**SETH LEVINE**

# INFORMATION FOR

**18 U.S.C. §1349**
**15 U.S.C. §§ 78j(b) and 78ff**
**17 C.F.R. § 240.10b-5**

**RACHAEL A. HONIG**
*ACTING UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

HEATHER SUCHORSKY
*ASSISTANT U.S. ATTORNEY*
*973-645-2802*
CHARLIE DIVINE
*SPECIAL ASSISTANT U.S. ATTORNEY*
*202-445-4573*